Good afternoon Mr. Adams, Good morning Mr.ators Before I begin I'd like to let the court know that Mr. Espinosa's counsel has given me two extra minutes as has Mr. Esperado-Ramirez's attorney so I'm taking 14 minutes I'd like to reserve three minutes or four minutes for rebuttal. With that being said I first want to touch on the search issue. I don't think that there can be much question that these affidavits lack probable cause. I mean if we look at the history of the circuit's law on affidavits it seems pretty clear there's absolutely nothing that touches upon reliability. There's no corroboration of anything other than innocent details. What about the good faith exception? On the good faith exception I would argue your honor that this case is really controlled by Weaver which I understand under Allen was limited to its facts but also if you look at Leakey this case I think is very close to Leakey and Leakey is cited by a case which I cite in my brief Wilhelm which is a fourth circuit case and if you look at I think it's Gibson again same thing no good faith so I think if you look at this case there's just absolutely nothing upon which a seasoned police officer could come to the conclusion that these have anything remotely close to probable cause and I think so factors two and three which are set forth in Weaver and then again I think it's Allen was the magistrate misled? No he was not misled. Two did the magistrate abandon his judicial or her judicial role? I would say yes. Was he affidavit so lacking in probable cause to render the belief in probable cause existence entirely unreasonable? I would argue yes. The factually deficient I don't think really applies here because that really deals with particular the place to be searched and the items to be seized but if you look at factors two and three I don't see how on this affidavit that you could come to the conclusion that there's good faith. I mean if you look at first the 77th Street affidavit all it says is a citizen went in there and the only thing they corroborate the only thing they corroborate is that there's a car in the driveway with the same license plate nothing more than that. The other one has one more piece of information that the magistrate knew the identity of the So unless the court has any questions about the search issues and the good faith I'm prepared to move on. The next issue is a very interesting issue whether or not we can conclude under a lien that the jury made a finding that there were two a 920C violation and a subsequent 920C violation. A lien tells us that the jury must make findings of fact before you increase the mandatory minimums so that's in play here. This case is not at least it is my position is not governed by court because that case deals with recidivism we're not dealing here with recidivism or prior convictions because there were no prior convictions at the time of Mr. Soto's trial. So what you have here are two counts 7 and 8 7 is using brandishing a gun in connection with a drug trafficking crime the dates are October 20 to the 22nd and then you have brandishing a gun in relation to a kidnapping. The problem in this case is and the problem would have been solved had the indictment charged in count 7 that the act in furtherance of the drug trafficking crime was specifically tying up Mr. Freeman and robbing him we wouldn't have this problem but you have count 7 and 8 is probably okay because it references a kidnapping so we know what that's predicated on but that kidnapping is also an act in furtherance of the drug crime. So we don't know what the jury decided they could have decided that the act in furtherance of the drug crime was the kidnapping and if that's the case then Johnson United States v. Johnson applies because it's a single transaction so here we're just at a loss as to what the jury decided. Now Judge Lawson had to make the findings where there were two separate incidents involving guns and that's true but we don't know that the jury concluded it the way he concluded it and that's precisely what a lien prohibits and that's the problem with this because they could have used the same act, the kidnapping, for both the drug trafficking and for the kidnapping. Again, the kidnapping is really not an issue because they found him guilty of a substance of offense. So that's my position. All of the cases cited by the government in their brief deal with recidivism or very clear cases where there's separate conduct. The carjacking, the three robberies that took place in Tennessee. Not one of their cases deals with the situation here and that's why I believe that Johnson controls this case. It's a straightforward argument. If the court has any questions I am prepared to try to answer. Did you present that argument to the district judge? Yes. And what was his reaction? He said I can make the finding that there were two separate acts, which is true, one the Freeman, tying up Mr. Freeman and robbing him, and two the kidnapping but the problem was he made that finding and not the jury and that's precisely what a lien prohibits. Any questions? No. Okay. Thank you very much. Good morning, your honors. May it please the court, I'm here this morning representing Hector Santana and I'd like to reserve three of my ten minutes for rebuttal if I may. Sure. Thank you. Your honors, the government presented evidence in this case that Hector Santana and others detained Eric Freeman and took $180,000 from him. The problem is that they didn't indict him on that charge. What they indicted him on was a substantive count of possession with the intent to distribute 500 grams or more of cocaine. That created a fatal variance in the indictment between the proof that was presented at trial and the indictment in this case and as such that count needs to be reversed. The evidence actually that the government presented was that there was never any intent to distribute the cocaine in this matter. Well, they brought the cocaine to Freeman, right? They brought the cocaine to Detroit and to where they met Freeman. That is correct. And they showed it to him and theoretically Freeman was going to buy it but they were really just going to defraud him. Exactly. Why isn't that possession with intent to distribute, at least it was going to be used for a purpose? Well, because if you read that into it, it takes out the word intent and this court's found that not only does there need to be intent but it needs to be the specific intent to distribute and I've tried to think of a scenario where this could come up and my hypothetical is that let's say instead of what occurred, that Mr. Santana was going over to Mr. Freeman's house for dinner and he had his three kilos of cocaine with him in a duffel bag. He comes into the house and places it in the front foyer and leaves it there, right? He has delivered the cocaine at that point because he no longer physically possesses it and it's over in Mr. Freeman's house but he didn't have the intent to relinquish that control over to Mr. Freeman in that case. If we read the statute to allow just delivery or to be the whole analysis under an 841 offense, then we're taking out the word intent from the statute in its entirety. This is a fairly unique set of circumstances in this case. Would it be intent to distribute if somebody hypothetically took a bag of the drugs to a person, gave it to the other person, let the person look at it and then took it back? Would that be intent to distribute? No. You have to intend to leave it with the other person. To deliver it, transfer control, yeah, that's the whole point. And the reason we say that is because we look at the opposite side of the coin, which is all the cases that we've had in the past about where the cocaine actually doesn't get transferred. When the person gets caught, before they actually transfer the cocaine to the person, we still allow convictions under 841 because their intent was to eventually deliver it to the person and transfer control. And that's why we allow those convictions to be upheld. In this case, there was never, it's actually in the record, each of the three kind of key witnesses in this case, Freeman and Codino and Bravo Garcia, all were specifically asked whether you ever had an intent to give that cocaine to Freeman, and the answer was no. As a matter of fact, Freeman, this is on page, or this record ID 2355, he says, I never received drugs from anyone, I've never received anything. So he never, number one, he never got anything. Number two, Codino and Bravo Garcia, who were part of this offense, said our intent was to never give the drugs to Freeman, our intent was to rob him. And that's a problem for the government in this case, because instead of, you know, they could have left it with that kidnapping charge, but they didn't. They decided on this possession with the intent to distribute 500 grams or more of cocaine, and there's simply no evidence to support that. The problem... What about the cases, and I don't have one particularly in mind, but the cases where the drug dealers are producing fake drugs, are those successfully charged as possession with intent to distribute when it's fake drugs that they're providing to their buyer? You know, I can't say I know for sure the answer to that question. I'm trying to think of a case myself offhand where it's completely fake drugs, or nonexistent drugs, you know, that's the other thing. They might be drug dealers, hypothetically, who have lots and lots of drugs, but this time they're going to give powdered sugar instead. Right. And I know, you know, and I don't know that I can give you a good answer to that, because I don't know of a case offhand where the federal government charges somebody with an 841 where it was just sugar the entire time. I don't know that. But this is important, you know, in this case, because without count two, it calls into question one of the 924C counts. There's a, you know, there's a seven-year, or a five-year, and a 25-year 924C count. They tied one of the 924C counts to count two of the indictment. If count two goes, then there's going to be a problem with that subsequent sentence. And unless there are any other questions on that issue, we would leave the balance of the time for a response. Yes? I'm questioning the characterization of this as a variance. I mean, I'm wondering if you couldn't just as easily characterize it as a situation where the government proved, taking, sort of basing it on the district court's ruling, that the government might have proved more than one objective for a criminal act, one charged and one not charged, but both criminal and purpose, and it wouldn't, it would be some additional surpluses in proof, but it wouldn't be a variance. Well, so it gets back to the sufficiency of the possession with intent to distribute, doesn't it? It's really more that than it is a variance. At the end of the day, it is a sufficiency issue because, but that is what all variances are in effect, because what our variance case law says is that we charged this offense, but we proved this other offense. And so when you do that, you're missing an element over here, and so it is insufficiency in that regard, right? But yeah, so it's one or the other, but certainly it qualifies as a variance issue in this case because of what they proved. Thank you. Thank you. Please support. Joseph Nisgar on behalf of Defendant Appellant Christopher Espinosa, I would reserve one of my eight minutes for rebuttal. Fine. Your Honors, the Defendant, Defendant Espinoza is even further removed from the knowledge of an intent requirement that the government was required to prove in this case regarding an intent to deliver the controlled substances on October 22, 2009. Mr. Espinoza was acquitted of the conspiracy count in count one and there were no facts from which the jury could find that Mr. Espinoza knew of the way that Mr. Freeman operated that he always had tested his drugs when he first came into possession of them or took them in order to test them for quality and purity. Since he was acquitted of that conduct and there was no tie tying him to count one, the sufficiency of the evidence or the lack of evidence of his knowledge and intent to distribute the cocaine on October 22 is completely lacking. The government's theory was an aiding and abetting theory that Mr. Espinoza aided and abetted his co-defendants to possess with intent to distribute the cocaine. However, there were two cars that were driven from Chicago to Detroit. One of them had cocaine in it and the other did not. The car that Mr. Espinoza was stopped in or allegedly stopped in because the question of his identification in that car is in dispute, but there was no cocaine in the car that Mr. Espinoza was stopped in. Likewise, the facts don't support a finding that he was present in the car when the cocaine was handed over to Mr. Freeman for purposes of testing or that he in any way was part of a plan or had any knowledge that Mr. Freeman was going to take the cocaine into his possession to test it first. The district court cited a case that they believe... Why couldn't he be still guilty of aiding and abetting his co-defendants? Because under an aiding and abetting theory, the government still has to prove that a crime was committed. That's still an element of the offense... So that's going back to your colleague's earlier argument. Sufficiency of the evidence arguments, correct. So even under the aiding and abetting theory, there is still no crime committed because there were no facts from which the jury could find that there was ever an intent on the relinquish possession and control and ownership of this package that was provided to him. The district court cited a case that they believed was on point where officers intended to plant evidence at a crime scene at the time of a search in order to then attribute those drugs that were planted to the defendant. However, in that case, it's obvious and there's an obvious inference that the drugs that would have been seized in that house during the search warrant would then be taken under the control of those police officers, taken into evidence for further prosecution of those individuals. So there would have been an intent to distribute and then relinquish control of those drugs to the police department or whoever the seizing agency was in that case. In this case, there is nothing from which the jury could have found that permanent control or possession was ever going to be turned over to Mr. Freeman, the drug dealer. The government, in their brief, argues that even if the drugs were not going to be turned over to Mr. Freeman, that ultimately they would have had to have been returned to the owner, the drug dealer, in Chicago. And so, under that theory, there was an intent to distribute or deliver back to the owner. However, it's our position... What is your position that the various defendants were intending to do with the drugs after they showed them to Freeman and Freeman tested them and then they got the money from Freeman and then they scammed him from the, and didn't give him the drugs? Does it matter what they were going to do with the drugs? They had the drugs. They had the drugs. However, there was no testimony elicited at the time of trial regarding what was going to happen after. So, I don't know what was going to happen after, and I don't think the jury was ever even... The jury was not ever presented with any scenario by which then the drugs would be returned to the owner. And the government raises that for the very first time in their appellee brief, and we assume their answer to our motion for our Rule 29 and Rule 33 motions, that because they raised it for the first time in their brief, that they've abandoned the issue and waived that issue. And then likewise, as co-counsel has stated regarding Count 8, that without a conviction on Count 7, which is the 924C count related to the drug trafficking crime, that Count 8 and the sentence that applied to it, the 25-year, would also fail as well, and in this case should be remanded for resentencing. So, I'm happy to answer any questions that the court may have. Thank you. Thank you. May it please the court, my name is Sanford Shulman, I represent the defendant appellant Juan Espada-Ramirez. I'd like to reserve one minute, I defer two minutes to brother counsel on a third issue. I'd like to take the opportunity of our argument to focus on two issues, but primarily one in detail, and that is the charge and conviction under the 924C statute. And in this case, the government charged in the fourth superseding indictment with violation of 924C with three specific firearms. And that's important to note because a Lama Mini Max, a Pietro Beretta, and a Colt Model Cup National were specifically named in the fourth superseding indictment. They were seized coming back from Detroit, and they were marked and admitted in evidence. And the jury was asked to decide whether Mr. Espada-Ramirez should be convicted of brandishing those firearms. It's not possession, it's brandishing under the statute, and the jury convicted. The defense filed both a Rule 29 motion and subsequent motions, but the trial court analyzed it and found that there was no question of fact as it relates to the firearms named in the indictment and granted the motion. The court, however, did not grant the motion on the second count of 924C, and this is the  As it relates to the 924C, it's important to note and it's not in dispute that Mr. Espada-Ramirez never provided those firearms, never went to Detroit, never was in the vehicle, never had any nexus to those firearms. It was an aiding and abetting count, wasn't it? It was aiding and abetting, but the same theory applies to the principle of those charges. The question is how is the aiding and abetting? Even the principle witness, Bravo Garcia, said, quote, he had nothing to do with the firearms. That was his quote. He didn't give it to us, didn't participate in it. Well, there's this Supreme Court case, Rosemond. Yes. So, I guess the question that I would have is, wouldn't it be enough for, under Rosemond, for Espada-Ramirez to aid and abet in the activities that were happening in Detroit and know that a gun was going to be present and perhaps brandished by his confederates in Detroit, even though Espada-Ramirez is in Chicago, but he's aiding and abetting that activity because he's guarding somebody in Chicago. How would you respond to that? I recognize the government relies heavily on Rosemond, and the district court judge, I thought, applied it in a way of sort of like a Pinkerton type of analysis. I thought the district judge rejected Pinkerton. He did. In fact, that specifically rejected it, saying you discarded it, it wasn't applied. But under a Rosemond type of analysis, the court somewhat adopted that in not granting our motion. The court said that, taking from what Your Honor just asked, that the government needs to demonstrate actual possession. The actual possession of the firearm is not necessary, nor must the government prove that the defendant performed some act that directly encouraged. However, the government must still prove that he knew one of his accomplices possessed the intent to assist or influence the commission on an underlying defense. That's exactly what the court ruled and what the question is. In this case, there is really no evidence of that nexus. The testimony from Mr. Garcia, Bravo Garcia, is that he had no connection to it. So the question is not, there's not any legal issue about the standard that the district court applied. You just disagree with the evidentiary sufficient. Yes, and I do it because the court applied the same evidentiary analysis to the other 924C. It's the same type of application, where an individual can't just be merely present. In fact, the judge noted that in his decision. Mere presence is not enough. You have to go beyond it. And I think what... So what did the district judge say as to why he was granting the motion for acquittal in the one but not in the other? Well, it was not clear, but he noted that he believed that Mr. Risperidu-Ramirez knew that the principals were armed and acted with the intent to assist and influence the commission of the underlying predicate crime. That was his analysis. He didn't rely on anything in specific. I do note that there was testimony that there were firearms in a garage, but still their principal witness maintained unequivocally that Mr. Risperidu-Ramirez had nothing to do with these firearms. And the indictment named three firearms, they were presented, and if I could just... The witness's testimony that another individual had nothing to do with firearms might be something for the jury to consider, but you can't impute to the witness knowledge of what the legal standard is. He might simply have meant that your client wasn't carrying the firearm or that he didn't own the firearm. I mean, that's just a lay witness's... So it's hard for me to see how one attaches much importance to that. Well, I agree it was one witness, and I agree you can't take it in isolation, but Mr. Risperidu-Ramirez never went to Detroit. He had no connection to it. So you're left with the testimony of Mr. Bravo Garcia. So we have to rely on his testimony, and the court did as well, and his testimony unequivocally was he had nothing to do with it. And yet we're jumping through these hoops and assuming that he does, and assuming that he had some... When you say he had nothing to do with it, he had nothing to do with what? He had nothing to do with the firearms that were recovered from... But if he knew that his colleagues were going to be carrying guns, wouldn't that be enough under Rosemond? He also has to, in addition to knowing, he has to take some affirmative act. But isn't it enough, I'm asking? Is it enough for him to take an affirmative act vis-a-vis the underlying drug transaction as opposed to affirmative act vis-a-vis the guns? Well, the drug transaction that he was a participant in was not the one in Detroit. They claimed that he had given drugs at some earlier time or different time. So the predicate crime had nothing to do with that date and time and place. So this 924C transaction has nothing to do with the Freeman matter in Detroit? It is unclear whether it has to do with the Detroit matter. The only evidence of his drug participation was that someone indicated he had brought drugs to him about 20 times. So it was not... He didn't go to Detroit. He didn't bring the drugs. He had no... What did the government allege was the drug transaction? It was a conspiracy theory that he was part of a co-defendant and allegedly was the right-hand man and picked up drugs on a number of occasions. And that's in light... So it was just a generalized drug transaction as opposed to the 924C being tied to a specific drug transaction? Yes. Yes. As a... Your time's up. Okay. If I can just conclude. I was going to also mention that the evidence of Nevada was similar to this in that it was extra evidence that came in that persuaded the jury in the wrong direction. If there's no questions, I'll take it. Thank you. Good morning. Mark Chastain for the United States. I'd like to begin with the second issue that Mr. Krieger raised on behalf of Mr. Sutter or addressed with this court today, and that is the Elaine and 924C issue, and then move to the search warrants and some of the other issues that have been raised by counsel. Mr. Krieger states to this court, argues to this court, that this case is not controlled by the Supreme Court's decision in Almendarez-Torres, which has been repeatedly preserved through subsequent Supreme Court opinions and opinions of this court, including Crendy and the more recent Elaine case. In this circuit, this court has recognized in the Mack case, which is discussed in our brief, that in fact, Almendarez-Torres does drive the issue. In that case, a defendant was convicted of three 924C counts related to robberies and challenged two of the 924C 25-year consecutive sentences on the basis that the district court had found the second or subsequent element, rather than submitting that to the jury, and said that Almendarez-Torres was no longer good law, or questioned whether Almendarez-Torres was good law, and that therefore, it should have gone to the jury. In response, this court said, in fact, Almendarez-Torres is still good law, and that was the end of the issue. I may have misunderstood, but I thought that the argument your opponent was making was that there were two, that the jury should have decided whether this was all one incident or two separate ones. I think part of the problem that we've seen here in the briefing and in argument today is a conflation of two separate issues. The first issue is, well, there are two issues there. One, can a defendant be sentenced for two separate 924C offenses? The other question is, who decides whether there are two 924C offenses? And you have to decide that second question first in this case, and that's why I'm talking about Almendarez-Torres and Mack. Those cases make it clear that when you're talking about the fact of convictions, it's the judge who makes that decision, not the jury. And there's been no cases cited to this court by any of the defendants that require a jury finding of second or subsequent. In fact, all of the cases go the other way. This court in Mack, the 11th Circuit, in the Davis case, and we cite in our brief analogous cases to the 924E armed career criminal statute, such as this court's recent decision in Nagy. Under that statute, in order for a defendant to receive a 15-year mandatory minimum sentence and up to a life sentence, so that statute actually raises the mandatory minimum and the statutory maximum, so it would implicate both Alain and Apprendi, the defendant has to have three prior drug offenses or three prior violent offenses. In order to make that distinction, and they have to be separate offenses, in order to make that call, a judge has to decide were they in fact separate offenses, and we discuss in our brief the three factors that a judge can take into account in determining. Encapsulated, the argument is that because the decision of whether there's a prior conviction is for the judge, then necessarily whether there's a second or subsequent conviction must also be for the judge. That's exactly correct. But here, I thought from the oral argument that the argument was that count 7 was brandishing in a drug trafficking crime, count 8 was brandishing in a kidnapping, and if the kidnapping was part of the drug trafficking crime, it was one transaction, one event of brandishing. That is their claim, but what I'm saying is before you even get to that point, you have to decide who's the right decision maker in this case to decide whether there's two separate counts, and my point is they've kind of glossed over it and tried to conflate it by arguing the facts rather than what the legal question is, and the first legal question is who makes the call whether there was a prior and then another 924C offense under the DO case from the Supreme Court. The government's position is, and I think well supported by the law, and there's no contrary law, that it's in fact the judge who makes that call. Once it's the judge who makes the call, then we get to the question of were there in fact two 924C offenses, and that is an issue for the district judge to decide by a preponderance of the evidence. In this case, Judge Lawson made that call. He presided over an entire trial, and when the defendant raised this issue, after having viewed all of the trial evidence, Judge Lawson found that there had been two separate offenses. In fact, I would note that the defense doesn't really even dispute that there were two separate uses of 924C. In the reply brief, Mr. Soto basically conceded that there was ample evidence which would have supported jury findings, much less a judge finding, that there were two distinct uses of a firearm, and that in fact there were two distinct trips and two distinct gun brandishing episodes. This is in the reply brief at page 13, and justly so that they made that concession because there's absolutely no evidence in this record to support their theory that there was, or a finding, that there was only one incident. In fact, all of the evidence is consistent that there were two uses. On October 20th, the people from Chicago, including Mr. Santana at Mr. Soto's direction, traveled from Chicago to Detroit. There, they kidnapped Jose Enriquez Enriquez and his cousin Victor and brought them back to Chicago. Mr. Soto questioned them in the garage in Chicago while brandishing a firearm, accompanied by Mr. Esparto Ramirez and the other kidnappers. Under that questioning, Mr. Enriquez Enriquez said, the only way I can get the money back is to go back to Detroit and rob Eric Freeman. He's the guy I sell cocaine to, and in order to do that, Freeman always wants to test the cocaine. I'm going to need some cocaine to show him, for him to test, before he'll show me the money. So Soto gives them three kilograms of cocaine, sends them back to Detroit the next day. In fact, the record is clear that Mr. Esparto stayed in the garage that night, the night of the 20th, guarding Victor and Enriquez Enriquez. On the 21st, they traveled back to Detroit. They made contact with Mr. Freeman, who tells them it's too late to do a drug deal on October 21st, so they stay at a hotel in Belleville, Michigan, which is just outside of Detroit, and then ultimately meet him on October 22nd. That's when they do the ruse drug deal, where they show him serially three different kilograms of cocaine, which he takes and tests. And then after he goes and gets the money and they go to another location, that's when they pull the same guns a second time on a separate day, and rob Mr. Freeman. If you could address, because it's pertinent now, the argument that one of your opponents has made, that there was no intent to distribute. Well, I think the record clearly supports it. Again, I think Mr. Shedd has rightly conceded that this really is a sufficiency issue, it's not a variance issue. So let's look at the evidence in this case. We have a drug trafficking conspiracy, we have two different defendants who, or three different defendants who ultimately have challenged this question. The evidence is Mr. Rispardo Ramirez was Mr. Soto's right-hand man, had conducted up to 20 kilogram transactions with Mr. Bravo Garcia on behalf of Mr. Soto, essentially he was a courier from Mr. Soto to Mr. Bravo Garcia. Mr. Bravo Garcia would then sell the cocaine to people in Detroit, primarily the Enriquez Enriquez brothers. Mr. Santana was Mr. Bravo Garcia's courier, he often took the cocaine from Chicago to Detroit and in fact delivered the cocaine to the Enriquez Enriquez brothers and Mr. Freeman, so he was familiar with how Mr. Freeman operated, and Mr. Freeman would always, on every occasion that's identified in the record, and I think there were three or four, wanted to test the cocaine by taking some portion of it from each kilogram and cooking it up to crack to verify its purity. But if they're bringing the cocaine to Freeman just to show him and let him test it, but then they're going to take it back, how can there be an intent to distribute? Well, the question is, do they intend to, is this cocaine intended for transfer to another person? So we have intent to deliver in two ways in this case. With this specific transaction, with this specific cocaine, it's clear that the defendants knew that Mr. Freeman would want to test it, that's the reason they're bringing cocaine. If they're just going to let him sniff it or test it however he tests it, but they're going to take it right back, how can that be an intent to distribute? They intend to rob him, that's their whole theory. That's correct, they absolutely intend to rob him, but what they're trying to do is graft onto the statute an element which doesn't exist, or a piece of the definition of transfer which doesn't exist, and that's the word permanence. There is no requirement in the statute, as Judge Lawson noted, that the drugs be permanently transferred to any specific person. What the evidence showed, and what the jury could rightly find under the sufficiency of the evidence test, a rational juror, is that these defendants, when they took the cocaine to Detroit, intended for Freeman to take possession of it and test it, and that then he would show them the money. Santana had had that experience, Bravo Garcia had had that experience. Is there any case that you would point us to, to say that a fleeting holding of a drug is enough to constitute distribution? I haven't identified any other than the Cortez-Caban case that Judge Lawson discussed, where some drugs were intended to be used to plant for a search warrant, but were never intended to be permanently transferred to the users in that case. The other way that we see intent is that this all took place in the context of a drug conspiracy involving many transactions, many kilograms of cocaine. Mr. Espinoza joined in this effort, knowing that the whole purpose of going to Detroit initially to kidnap Enriquez Enriquez was to recover Soto's lost cocaine, or the proceeds of it, that he had sent to Detroit for distribution. He traveled to Detroit. He was present when they brought Enriquez Enriquez back to the garage, and he was questioned and came up with a plan to recover this lost money through this robbery scheme. He knew that this was all about a drug distribution conspiracy. Similarly, Mr. Santana was knee-deep in this drug distribution conspiracy. The point was not, as Mr. Nisker said, that they were ultimately going to bring these three kilograms back to Mr. Soto, and that would then be the distribution. The point was, he wasn't giving them these three kilograms to use. He wasn't getting them to go to Detroit, rob Eric Freeman, and then party with three kilograms of cocaine. In fact, we saw that. I think, Judge Moore, you asked what were they going to do after, and the question is answered by what they did after. They started to bring the cocaine back to Chicago. They were arrested on their way back to Chicago after robbing Eric Freeman, and the police found the three kilograms of cocaine in the van, and it's clear from that, or the jury can infer from that, that it was going to come back to Mr. Soto for use in his drug distribution. So, it really doesn't matter, so are you agreeing that it doesn't really matter what happened in the events with Mr. Freeman, that all that matters is that this was a quantity of drugs that was eventually going to be distributed? I think it's both. I think you can look at it both ways. They knew specifically that these drugs were going to go to Mr. Freeman, that he would take them and test them. Yes, they were eventually going to take them back, but eventually, these drugs were going to be distributed to other people because they were used as part of this drug distribution, that it had not been given to them for their personal use. There were going to be other end users of this cocaine. We're talking about three kilograms of cocaine, just as a matter of sort of common knowledge or judicial notice, three kilograms of cocaine is not a use amount of cocaine. At some point, you should talk about the search warrants. Yes. Mr. Krieger said there's really no question that there was no probable cause on the face of the search warrants in this case, and Judge Lawson agreed with him, but it's the government's position that Judge Lawson and Mr. Krieger are incorrect. If you look at the Dyer case, this case is very close to the facts in that case, where an informant who had been in a rental cabin saw a drug transaction, saw more drugs, went to the police, and described some vehicles that were outside the cabin, and the police went with that informant to the cabin, saw the vehicles, saw the defendants, and got a search warrant. What corroboration of non-innocent facts was there? There were no corroboration of non-innocent facts, but that's not required under the Dyer case. What about under Higgins? Well, in Higgins, I think the critical distinction with Higgins is the fact that in that case, the court emphasized that there was no indication that the informant had ever actually been inside the apartments. And so when you're trying to get a search warrant for a place where you have an informant who can't specifically say, or at least on the face of the search warrant, can't say that there are in fact or he saw drugs in that place, you're missing a crucial nexus to that place to establish probable cause, unlike in Dyer, and unlike in this case where the informant had actually been inside the place to be searched. And the court noted in Dyer that extensive corroboration would not be necessary where an informant witnessed illegal activity in the premises to be searched and was known to the officer writing the affidavit. The court said there was sufficient indicia reliability without substantial independent police corroboration, and that's at page 392 of that opinion. So explain what your best case is about the facts here in terms of what was known about the informant, what was told to the magistrate, and so forth. You mean the best facts in this case, or the best... Why do you say Judge Lawson was wrong? Well, one thing is I think Judge Lawson's character, he sort of commingled two different standards. He called him an anonymous informant. Usually it's an anonymous tipster, which is one class of person, somebody completely unknown to law enforcement, we don't know who that person is. That absolutely would require a significant amount of corroboration, versus a known or confidential informant. And... What did we have here? We have a confidential informant. It's clear on the face of the affidavit that this person met with the police officer, Atheans, and in fact gave the information, went to the two places to be searched, and identified the places to be searched. In addition, the informant actually went, at least according to the affidavit, went to the magistrate with the police officer, signed the affidavit, J. Doe, and said on the face of the search warrants themselves that the affidavit appeared with the Atheans, and subscribed and swore to the rest of the affidavit. Each of them says right at the beginning of the complaint for a search warrant, the complainant affidavit and J. Doe now appear before the underside judge, and J. Doe signs it along with the officer affidavit on each search warrant. And the magistrate, who appears to be the same magistrate in both cases, also certified that it had been subscribed and sworn before her on each date that the affidavit was signed. So there's every indication that this is a known informant, that the informant swore to the affidavit and appeared before the magistrate. Only one affidavit specifically says that the person appeared, they had a line saying they were available for questioning, but both of them indicate that the affiant appeared before the judge. There's the affiant. I thought the affiant was the officer. It's kind of an unusual situation. We don't see this too often in Detroit, but in this case we have basically two affiants. You have the informant and the affiant officer, both of whom appeared before the magistrate according to the affidavit, both of whom signed the search warrant affidavit. And in fact, I would note with respect to the South Mozart affidavit, there's a handwritten change on the very last line of the first place of the complaint. This is page ID 1982, where they write in Tony, and there are initials there, JD and MJ, MJ being the initials for Mark Jacob, the police officer. So clearly the informant was reading the affidavit and signing off on the accuracy of it when he initialed the handwritten change. All right. I'm not sure, but I think I'm correct that this was not a typical hearing on a motion to suppress where evidence was presented other than the affidavit. Is that correct? That's correct. There was no evidentiator here. Nobody sought to establish other than by the face of the affidavit anything as to what or whether there was any further exchange. That's correct, Your Honor. In fact, this came up in the context of a post-trial motion for a new verdict alleging ineffective assistance of counsel by Mr. Soto's trial counsel. Well, it would have been, I mean, the defendants would have had the burden in that procedural context to have come forward with that evidence, is that correct? That's correct. Because they were attempting to show that the good faith exception did not apply. That's correct. So, to sum up, we have in this case affidavits with a known informant who, in fact, swore to the affidavit, who stated that he had been inside each residence, who saw the illegal activity, in each case described where the illegal activity took place. In one case, the shot-off shotgun in the bedroom. In the other case, I believe it was in the entryway or living room of the house where he purchased cocaine. In each case, the informant admitted to participating in criminal activity, in one case, possessing a sawed-off shotgun, in the other case, buying cocaine, and then went with the officer to, in fact, confirm which location. So, it's the government's position that there was probable cause. In any event, Judge Larson, even if he was correct that there was probable cause, he was also correct that there was good faith, much for much of the same reasons, that there was, if there was not probable cause, it was a very, very close call, as, of course, the court has characterized it in some other cases, and the affiant officers would have every reason to believe that having taken their informant to a magistrate and signing an affidavit that laid out the facts that we've discussed here, that they had a valid warrant. I would note that under the Herring case that is cited in the government's brief, the Supreme Court has made it very clear, and this court has recognized in subsequent cases, which I apologize are not cited in our brief, but I'd be happy to provide additional citations, but cases such as Kinnison and Master, that Herring really shifted the paradigm here in favor of preserving evidence unless it can be shown that the officers acted with gross negligence or reckless disregard, and, in fact, I think in the Master case, this court recognized that really the emphasis now is presumption against exclusion and towards preserving evidence unless there is really egregious, highly culpable conduct by the officers. There has been no showing of that kind of conduct here. In fact, the officers had very, very solid search warrant affidavits. I'll just review my notes, Your Honor, and see if there's anything else that counsel addressed. One concern that was raised is the brandishing charge against Rispardo Ramirez, if you could address that. Yes. Your Honor, you, Judge Moore, asked Mr. Shulman directly whether Rosemond really drives the answer in this case, and the answer is yes. Here we have Mr. Rispardo Ramirez charged under an aiding and abetting theory, and let me take a step back. The question here is not, there was a lot of questions about what Judge Lawson found, and Judge Lawson's order is very helpful in sort of guiding us through the evidence, but, of course, the question here is whether the jury had sufficient evidence, and this court conducted de novo review, so it's not bound by Judge Lawson's characterization of the evidence at all. But, in any event, Judge Lawson was correct in his finding that there was sufficient evidence for the jury to find, rationally, that Mr. Rispardo Ramirez knew that his accomplices were going to be using and brandishing firearms when they came to Detroit to rob Eric Freeman. Do you agree, then, that under Rosemond, there has to be evidence that Rispardo Ramirez knew his accomplices would be brandishing a firearm during the drug transaction? That's correct, that Rosemond requires some prior knowledge, as I believe how the court characterizes it, that an accomplice would be using or possessing or brandishing whatever the element is, a firearm, in the course of the predicate crime. Because here it was a brandishing count, there would have to be knowledge that the accomplices would be brandishing as opposed to just having a gun? That's a little unclear under Rosemond, but given that Elaine has decided that brandishing would have to be proven as opposed to just use, I think that's probably a fair characterization that is sort of an element that the defendant would have to know. So what evidence was there? Well, here we have Mr. Rispardo coming to the garage after the victims in Detroit had been kidnapped. He and Mr. Soto both came to the garage carrying firearms themselves. He was present when Mr. Soto himself brandished a firearm, threatening the victims in order to extract information from them and to try to get them to repay the money that he had lost. This is in Chicago? This is in Chicago, leading up to the robbery of Mr. Freeman. The guns, there's testimony that the guns that had been used in the kidnapping and that were then subsequently used in the robbery were present in the garage. So we have a total of at least five guns, Mr. Rispardo having one of them and then the three that are charged in the indictment. He was present when Mr. Soto was questioning the victims. He guarded them overnight with a gun before the next day when the other people went back to Detroit. He stayed in Chicago with a gun, guarding Victor, while the others took those three guns back to Detroit. He was present. They talk about the plan being hatched to go back to Detroit in the garage. There's some indication that Mr. Rispardo wasn't involved in the actual planning because his job was to stay in Chicago, but there's every indication from which the jury could conclude that this discussion about going back to Detroit, luring Mr. Freeman with cocaine, taking cocaine to lure him, and then robbing him was in the garage, and then his accomplices came back to Detroit and brandished the guns to rob Mr. Freeman. Suppose that Rispardo Ramirez was not guarding the kidnapped victim in the Chicago location, but Rispardo Ramirez did not go to Detroit. Would he still be able to be convicted of aiding and abetting the brandishing of a firearm in Detroit in the Freeman matter? I think that that's a closed question, Your Honor, but of course in this case he did further the efforts by taking that affirmative step of guarding them overnight, Mr. Enriquez, Enriquez and Victor, so that he would not escape and they could then accomplish the robbery and then holding Victor while his cousin went back to Detroit. So he did take an affirmative step to further this. The other thing I'd like to note is Mr. Schulman said there was no tie of this 924c count to a specific act, that it was totally related to the conspiracy charge. That's not true. It is related to the conspiracy charge and this act wasn't furtherance of the conspiracy, but it also was charged with Count 2 being a predicate act. Count 2 is a specific possession with intent to distribute on October 22nd, the indictment specifically says, on or about October 22nd, 2009. So the indictment is very clear that there was a specific date associated with this use of these guns for the 924c count. And getting back to, I think this kind of circles back to the Elaine issue, the jury was instructed properly that the 2924c counts, that count 7 related to the drug trafficking counts, counts 1 and 2, and that count 8 related to the conspiracy to kidnap and kidnapping charge and all of the evidence in this case pointed to the possession with intent to distribute as it was charged occurring on October 22nd, 2009, and that the kidnapping occurred on October 20th of 2009. So within the jury's verdict itself, although they were not asked to specify the dates, they were told the charge dates in the jury charge. They found both defendants, Soto and Santana, guilty of both offenses, the kidnapping and the possession with intent to distribute, and all of the evidence as conceded by Mr. Soto in his reply brief shows that there were really two separate uses of the firearms in this case. Does the court have any additional questions? I don't think so. Thank you. I probably should have kept more time for rebuttals, but I want to first, I think Mr. Chastain made a factual error. On the 77th Street affidavit where the most incriminating evidence, 77th Place affidavit where the most incriminating evidence came out of, the citizen did not appear at the magistrate, or at least there's no showing within the four corners of the affidavit that he appeared. It looks like there's a J. Doe signature on the affidavit. I didn't see that. On the 77th Place or on the Mozart? I thought it was on the 77th Place and on the Mozart, but I could be wrong. I thought that the signature is on both. I might be wrong about this too, but the statement that the affiant was present is on one, and I can't remember what the time differential is. Are they issued at the same time? No, they're not. They're not. So maybe he was present, maybe not. Right. He may have signed the affidavit, but wasn't present. There's no question he was present on the Mozart. I didn't understand Mr. Chastain to say anything about that. Okay. All right. Well, that's okay. But in any event, I want to talk about Dyer because I think that is an important case, and in fact, I think it was authored by you, Your Honor. Let me talk about the facts. Perhaps. Pardon? I said perhaps. Perhaps, although Judge Moore did dissent. In any event, in that case, what do we have? We have he was contacted by an informant. He met with the informant. The informant showed the office of the rental cabin where cars matching the informant's descriptions were parked. He then conducts surveillance, identifies Dyer in a female fitting, glances description. Also, a lieutenant faxed copies of outstanding warrants from North Carolina, charging Dyer and Glantz with drug crimes, including one warrant for Dyer for felonious possession, manufacturing and transporting methamphetamine. He had a criminal history involving methamphetamine, and Dyer was on probation. Contrast this with this case. There's an allegation on 77th Place that he uses a weapon as a protection because the Latin King street gangs are at war with the Satan disciples. There's no corroboration that they're at war with each other. There's no corroboration that the client is even a member of the Latin Kings. So the only thing we know on 77th Place is that he has a Chevy trailblazer, and that's the only corroboration there is. If you look, and I don't have a lot of time, but if you look on page six of my brief, your honor, of my reply brief, what happens in Higgins? The police arrest three men in possession of a half ounce of powder cocaine. All three people said they got the cocaine from Higgins' residence. So not only does the person who the drugs are found on say, I got it from Higgins' restaurant, but they independently verify with two or three other passengers in the car that it came from that location, which is a far cry. But in any event, I set out on page six and seven, without taking up too much time, the differences between the cases the government is relying on and our case. And I think the factual differences are extremely significant. One other thing I'd like to talk about, and that is, which I think is an important case, was Allen, United States v. Allen. And in Allen, they talk about, I mentioned this earlier, three cases where they agree that there was insufficient evidence. And they mention them in Allen, Leakey, Gibson, and Mendoza. And what does the Allen case say? These cases rightly insisted upon substantial independent police corroboration because of the absence of any indicia of the informant's reliability. So Allen specifically says, when you have no indicia of the informant's reliability, you better get a corroboration. And there was no corroboration, and there was nothing whatsoever that in any way corroborated the statements of the informant. There's one case that I think is also important. The case, and I forgot which case it is, but it's cited in the brief, where a handyman is down in a basement, sees marijuana. He's a tradesman. He calls up and says, I saw all this marijuana in the basement. He's a concerned citizen. And they said, that's not enough. It's a Sixth Circuit case. Your red light is on. Okay, can I just respond very quickly to the lien issue? I think your time is up. Okay. Your Honors, the government can't have it both ways with regards to count two. They argue, when they're arguing the 924C issues, they're saying, look, the indictment charge is a date and time specific, and these are on different days, and even though it's on or about, this happened on October 22, 2009. Then when it gets to count two, they say, well, they possessed these drugs on October 22, 2009, but we don't know what happens after, if they get back to Chicago, that because of the quantity, they could be distributed somewhere down the road. But that's not what the indictment alleges. The indictment alleges that on or about October 22, 2009, in the Eastern District of Michigan, this federal crime took place. Not what might happen to these drugs in Chicago. Certainly when they were given back to Soto, maybe he could have distributed them to somewhere else in the world from Chicago on some other date in November or December of 2009, but that action doesn't prove this offense that's charged in this indictment in this case. And that's the problem with the government charging this specific count in the particular way that they decided to do so in this case. And again, without count two, and they even admitted in their response that count seven, the 924C, is tied to count two. So, therefore, without count two, there's a problem with count seven, and we have a problem here. And I would cede the rest of my time to my co-counsel. In justice, Mr. Graham, on behalf of Mr. Espinoza, just as co-counsel said, as there is a specific date associated with the 924C count, there's a specific date associated with when these defendants allegedly had the intent to deliver, and that is on specifically October 22, 2009, not eventually whether it was going to be delivered to someone else or at some other time. That is the charge that these defendants were put on notice to defend against, not some other intent in the future. And I guess that dovetails with the variance argument, too, because, again, the defendants were on notice that that is when they had the intent. I would yield any additional time as well to co-counsel. Mr. Krieger. Mr. Krieger, your friends have yielded the time, and I don't know, did you have a rebuttal also? I may have misspoke during my argument, and I just want to make sure I'm clear that the indictment on count seven and eight, one of which was dismissed, specifically alleged that on about October 20th to the 22nd of 2009. So any other allegations of drug activity are not included in that scope of time in the city of Detroit, 300 miles away from where Mr. Ramirez was, that he knowingly possessed and brandished three specifically identified firearms. And our position is clear that that's the indictment, that was the charge, 300 miles away, there was no allegations or credible evidence. I guess the counterargument is it's kind of a stretch to say that your client was not going to, was going to think that the robbery would be accomplished by leaving the guns in their pockets or concealed. I mean, that's the problem for you, isn't it? There is a difference between possession and brandishing. I mean, if they were going to get the guns out to use them in accomplishing the robbery, that would be brandishing, right? Yes. And interestingly, though, he was found not guilty of the conspiracy to commit. So this whole conspiracy thing falls apart, and there's no evidence that he was part of any plan to brandish. Thank you. Thank you. Very briefly. The lien issue is not as Mr. Chasting argues. It's exactly what you said, Judge Moore. My position is very clear, that Alamander's-Torres does not apply. Nagy is completely not on point. That is a case where a man had prior conviction, Alamander's-Torres controls, no question about it. Mack is a case where, during the trial, they charged three separate robberies, identified dates, identified victims, and three separate convictions. So we know what the jury found beyond a reasonable doubt. The position here is very simple. We don't know what the jury decided. The kidnapping, I can see. I can see there was evidence, as I said, ample evidence, to infer that the jury-for the jury to infer the Freeman robbery. But we don't know that that's what they decided. We know that the indictment charged the exact same time period, the 20th to the 22nd, the exact same guns, and we don't know what they predicated their verdict on. And the only way this issue was decided, by the judge deciding what the jury's basis of the verdict was. He can't do that under a lien, is my position. Very simple, very straightforward. And that's why this case is different than Mack or Nagy. Thank you. Thank you all for your arguments. We appreciate it very much. The cases will be submitted, and will the clerk...